1  B. Kristian W. Rasmussen, FL Bar No. 0229430
   Cory, Watson, Crowder, & DeGaris
2  2131 Magnolia Avenue, STE 200
   Birmingham, AL 35205
3  Phone: (205) 328-2200
   Fax: (205) 324-7896
4  E-Mail: krasmussen@cwcd.com

5  Attorneys for Plaintiff

FILED

FEB 1 9 2008

E-filing RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                      (SAN FRANCISCO DIVISION)

11

12  **In re: Bextra and Celebrex Marketing Sales**      **MDL No. 1699**
    **Practices and Product Liability Litigation**
13                                                       **District Judge: Charles R. Breyer**
                                                         **Magistrate:**
14

15

16  **MARIE A. TEAL**, individually,                    Case No. CV 08    1008    CRB

17
                                                         **CIVIL COMPLAINT**
18                  Plaintiff,

19  v.
                                                         **JURY TRIAL DEMANDED**
20  PFIZER, INC., PHARMACIA CORP., and
    G.D. SEARLE, LLC, (FKA G.D. SEARLE
21  & CO.),

22                  Defendants.

23

24          PLAINTIFF, **MARIE A. TEAL**, individually, pursuant to Pretrial Order 12, by

25  and through counsel and pursuant to applicable law, brings this action against Defendants

26  PFIZER, INC., PHARMACIA CORP., and G.D. SEARLE & CO. (hereafter "Defendants") and

27  alleges as follows:

28

Bextra-MDL                                                              COMPLAINT

**I.    PARTIES**

1.      This is an action for damages arising from Defendants' design, manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe medication Valdecoxib, trade name BEXTRA® ("Bextra").

2.      Plaintiff is and was at all relevant times an adult resident citizen of New Mexico, residing at the address in the City, State and County identified in Section IV(A) herein. ("Named Plaintiff's Home District"). The Named Plaintiff's Home District is proper for purposes of remand, transfer, and venue.

3.      Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business in New York.  In 2003, Pfizer acquired Pharamcia for nearly $60 billion.  At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name Bextra in Named Plaintiff's Home District and nationwide.

4.      Defendant Searle ("Searle") is a Delaware corporation with its principal place of business in Illinois.  At all relevant times, Searle has been engaged in the business of marketing and selling Bextra nationwide and in Named Plaintiff's Home District.  Searle is a subsidiary of Pfizer, acting as its agent and alter ego in all matters alleged within this Complaint.

5.      Defendant Pharmacia ("Pharmacia") is a Delaware corporation with its principal place of business in New Jersey.  At all relevant times, Pharmacia, and its predecessors in interest have been engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling Bextra nationwide and in Named Plaintiff's Home District.

**II.    JURISDICTION AND VENUE**

6.      This is an action for damages, which exceeds seventy-five thousand dollars ($75,000.00).

7.      There is complete diversity of citizenship between the Plaintiff and Defendants.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A.

Bextra-MDL                                    - 2 -                                    COMPLAINT

1    § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and

2    because there is complete diversity of citizenship between Plaintiff and Defendants.

3    8.    This action is being filed in the Northern District of California Pursuant to

4    MDL 1699, Pretrial Order No. 2. However, venue is proper in the Named Plaintiff's Home

5    District pursuant to Pretrial Order 12 and 28 U.S.C.A. § 1391. Defendants marketed, advertised

6    and distributed the dangerous product in the Named Plaintiff's Home District, thereby receiving

7    substantial financial benefit and profits the dangerous product in the Name Plaintiff's Home

8    District, and reside in the Named Plaintiff's Home District under 28 U.S.C.A. § 1391(c), such that

9    venue is proper.

10    9.    At all relevant times herein, Defendants were in the business of designing,

11    manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and

12    selling their product, Bextra. Defendants at all times relevant hereto designed, developed,

13    manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce

14    (including Named Plaintiff's Home District) the aforementioned prescription drug. Defendants

15    do substantial business in the State of Named Plaintiff's Home District, advertise in the district,

16    receive substantial compensation and profits from sales of Bextra in the District, and made

17    material omissions and misrepresentations and breaches of warranties in the District so as to

18    subject them to *in personam* jurisdiction in the District. In engaging in the conduct alleged herein

19    each defendant acted as the agent for each of the other defendants, or those defendant's

20    predecessors in interest.

21    **III.    INTERDISTRICT ASSIGNMENT**

22    10.    Assignment to the San Francisco Division is proper as this action is related

23    to *In Re: Bextra and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to

24    the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6,

25    2005.

26

27

28

Bextra-MDL                                          - 3 -                                          COMPLAINT

1  **IV.  FACTUAL BACKGROUND**

2  **A.  Facts Regarding Plaintiff**

3  11.  Plaintiff, **MARIE A. TEAL**, is an adult resident citizen of New Mexico,

4  residing at 5700 Mariola Place, NE, Albuquerque, NM 87109 in Bernalillo County. For purposes

5  of remand, transfer and venue, this is in the District of New Mexico. **MARIE A. TEAL** was

6  prescribed, and began taking, Bextra during 2004. As a direct and proximate result of using

7  Bextra, Plaintiff suffered severe cardiovascular injuries. Specifically, on or about January 29,

8  2005 Plaintiff suffered a cardiovascular injuries including a heart attack which caused Plaintiff's

9  damages and injuries set forth herein.

10  12.  Unaware of the risks presented by Bextra, or that Bextra was the cause of

11  the respective injuries, Plaintiff continued to take Bextra until the date of her adverse

12  cardiovascular event.

13  13.  Plaintiff and Plaintiff's healthcare providers were at the time of Plaintiff's

14  adverse cardiovascular event unaware—and could not have reasonably known or have learned

15  through reasonable diligence—that such injury directly resulted from Defendants' negligence and

16  otherwise culpable acts, omissions, and misrepresentations or from Plaintiff's ingestion of Bextra.

17  14.  Plaintiff used Bextra in a proper and reasonably foreseeable manner and

18  used it in a condition that was substantially the same as the condition in which it was

19  manufactured and sold.

20  15.  Plaintiff would not have used Bextra had Defendants properly disclosed the

21  risks associated with the drug.

22  WHEREFORE, Plaintiff demands judgment against Defendants and seeks

23  compensatory damages, and exemplary and punitive damages together with interest, the costs of

24  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

25  **B.  Facts Regarding Bextra**

26  16.  Bextra is one of a class of pain medications called non-steroidal anti-

27  inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade

28  name Advil) are examples of well-known NSAIDs.

Bextra-MDL                          - 4 -                          COMPLAINT

1    17.    NSAIDs reduce pain by blocking the body's production of pain
2  transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX
3  enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and
4  COX-2 enzymes.

5    18.    In addition to decreasing inflammation, the prostaglandins that are
6  supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the
7  stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the
8  medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric
9  tissue is hampered and as a result can cause harmful gastrointestinal side effects, including
10  stomach ulceration and bleeding. Prostaglandin I2 is the predominant cyclooxygenase product in
11  endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation,
12  and preventing the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit
13  Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected.
14  Thromboxane A2 is a potent platelet aggregator and vasoconstrictor which is synthesized by
15  platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction,
16  the COX-2 inhibitors support it. Traditional NSAIDs like aspirin reduce pain/inflammation and
17  therefore pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be
18  expected, traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do
19  not cause blood clots, rather they actually reduce the risk of clots and help protect heart function.

20    19.    Defendants and other pharmaceutical companies set out to remedy these
21  ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors
22  that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of
23  gastric tissue while still reducing inflammation.

24    20.    In making this decision, Defendants and their predecessors in interest either
25  intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2
26  inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood
27  clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,
28  unstable angina. The vasoconstriction and fluid retention cause the hypertension.

Bextra-MDL                              - 5 -                              COMPLAINT

1    21.    The defendants launched Celebrex, the first of the three major COX-2

2  inhibitor drugs, in early 1999 and initiated a massive marketing campaign to convince doctors and

3  consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs. In

4  May, 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

5    22.    Seeking increased market share in this extremely lucrative market,

6  Defendants, and their predecessors in interest, also sought approval of a "second generation"

7  selective COX-2 inhibitor and filed for FDA approval of Bextra on January 16, 2001 for the

8  (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief

9  of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

10    23.    The FDA granted approval of the new drug on November 16, 2001, for two

11  particular uses: (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms

12  of osteoarthritis and rheumatoid arthritis.

13    24.    The FDA did not grant approval to market and promote Bextra for the

14  management or prevention of acute pain.

15    25.    The FDA did not grant approval to promote Bextra as more effective than

16  other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers

17  or gastric bleeding.

18    26.    Even without a label that allowed Defendants to legitimately claim superior

19  safety, when Defendants, and their predecessors-in-interest, began marketing Bextra in early

20  2002, Defendants and their representatives and agents misrepresented the safety profile of Bextra

21  to consumers, the medical community, healthcare providers, and third party payors. Defendants

22  proceeded to promote, market, sell, and distribute Bextra as a much safer and more effective pain

23  reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

24    **C.    Facts Regarding Bextra's Safety**

25    27.    The potential for cardiovascular risk of selective COX-2 inhibitors was

26  known to Defendants long before the FDA granted market approval for Bextra. By 1997, and

27  prior to the submission of the New Drug Application (the "NDA") for Bextra, Defendants were

28  aware that, by inhibiting COX-2, Bextra altered the homeostatic balance between prostacyclin

Bextra-MDL                                   - 6 -                                   COMPLAINT

1    synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing

2    blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of Cardiovascular*

3    *Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954. Although all

4    COX-2 inhibitors have this mechanism of action, Bextra was the most selective COX-2 inhibitor

5    proposed for approval. Accordingly, it had the greatest potential to cause adverse cardiovascular

6    and cerebrovascular events.

7        28.     As Pharmacologist, Dr. Garrett Fitzgerald, of the University of

8    Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on

9    October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as

10   Bextra, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet

11   aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

12       29.     Nevertheless, the Defendants submitted an NDA to the FDA for Bextra,

13   omitting information about the extent of the risks associated with Bextra. Without a complete

14   picture of the potential hazards associated with the drug, the FDA approved Bextra on or about

15   November 16, 2001.

16       30.     Based on the studies performed on Bextra, other COX-2 inhibitors, and

17   basic research on this type of selective inhibitor which had been widely conducted, Defendants

18   knew when Bextra was being developed and tested that selective COX-2 inhibitors posed serious

19   cardiovascular risks for anyone who took them, and presented a specific additional threat to

20   anyone with existing heart disease or cardiovascular risk factors.

21       31.     Studies show that selective COX-2 inhibitors, including Bextra, decrease

22   blood levels of a prostacyclin. When those levels fall, the arteries are more vulnerable to clotting,

23   high blood pressure, heart attack, and stroke.

24       32.     The defendants marketed Bextra in the United States for three years (April,

25   2002 – April 7, 2004). During that time the FDA forced the defendants to strengthen the warning

26   label several times. The enhanced warnings followed in the wake of the results of additional

27   cardiovascular studies performed by Defendants, as well as numerous complaints to the FDA

28   regarding various adverse events.

Bextra-MDL                              - 7 -                                    COMPLAINT

33.     Prior to strengthening the warning for Bextra, Defendants had knowledge

of the coronary and cardiovascular safety risks of Bextra from several studies. *See e.g.*, Otto,

E.O., *Efficacy and Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in*

*Patients Undergoing Coronary Artery Bypass Surgery*, *The Journal of Thoracic and*

*Cardiovascular Surgery*, June 2003 at 1481.

34.     Even Defendants' own (and Pfizer funded) post- drug approval meta-

analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data

showing an increased cardiovascular risk in patients treated with Bextra after undergoing

coronary artery bypass graft surgery.  Observed events included heart attack, stroke, and blood

clots in the legs and lungs.  The results were particularly relevant and striking as each of the study

participants who was a post-bypass surgery patient was taking anti-clotting agents at the time

their exposure to Bextra was being tracked.

35.     In mid-January 2005, a peer-reviewed paper from the University of

Pennsylvania found that in patients having heart bypass surgery, those who took Bextra in the

intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a

heart attack or stroke.

36.     Despite years of studies on selective COX-2 inhibitors, as well as the

disturbing new studies specifically analyzing the risks of Bextra, Defendants failed to take any

action to protect the health and welfare of patients, but instead, continued to promote the drug for

sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis

Drug Advisory Committee meetings.

37.     On April 7, 2005, the FDA finally insisted that Defendants "voluntarily

withdraw" Bextra from the U.S. market, stating:

> . . . the Agency has concluded that the overall risk versus benefit
> profile of Bextra is unfavorable.  This conclusion is based on the
> potential increased risk for serious cardiovascular (CV) adverse
> events, which appears to be a class effect of non-steroidal anti-
> inflammatory drugs (NSAIDs) (excluding aspirin) ... and the fact
> that Bextra has not been shown to offer any unique advantage over
> the other available NSAIDs. (FDA Alert for Healthcare
> Professionals, April 7, 2005.)

1    38.    Continuing, the FDA noted:

Bextra has been demonstrated to be associated with an increased
risk of serious adverse CV events in two short-term trials in patients
immediately post-operative from coronary artery bypass graft
(CABG) surgery .... FDA has concluded that it is reasonable to
extrapolate the adverse CV risk information for Bextra from the
short-term CABG trials to chronic use given the fact that other
COX-2 selective NSAIDs have been shown in long-term controlled
clinical trials to be associated with an increased risk of serious
adverse CV events (e.g., death, MI, stroke), and the well described
risk of serious, and often life-threatening gastrointestinal
bleeding .... To date, there have been no studies that demonstrate
an advantage of Bextra over other NSAIDs that might offset the
concern about the serous skin risks, such as studies that show a GI
safety benefit, better efficacy compared to other products, or
efficacy in a setting of patients who are refractory to treatment with
other products."

39.    Dr. Garret A. Fitzgerald, cardiologist and pharmacologist at the University

of Pennsylvania, presented the preliminary results of his Bextra study at the American Heart

Association meeting in New Orleans, Louisiana. His study, containing 12 trials including 5,930

patients, found 2.19 times the number of strokes among patients given Bextra. *Named Plaintiff's*

*Home District Times*, Nov. 10, 2004.

40.    Instead of studying Bextra prior to its market launch, the Defendants

simply relied upon data and information gathered from Celebrex trials and studies. The Celebrex

data put Pfizer on notice that Cox-2 NSAIDs are, at the very least, associated with a

disproportionately increased number of adverse cardiovascular events. Taking the results from

the Celebrex trials in conjunction with the available medical literature; the Defendants knew

about the increased incidence and association between Bextra and the potentially life-threatening

dangers it could cause.

41.    The Named Plaintiff's Home District Times uncovered the truth about the

inadequate studies by interviewing Pfizer researcher Dr. Feczko - Pfizer's president for

worldwide development.

Over all, Pfizer has performed much less research on Bextra than
on Celebrex, Dr. Feczko said. Most of the company's studies of
Bextra have been short term, with many lasting only two weeks.
As a result, Pfizer has less data to support its contention that Bextra
is safe , he said.

Bextra-MDL                                    - 9 -                                    COMPLAINT

1

2          ***

3          Dr. Feczko of Pfizer explained that the company felt it was not as
           important to study Bextra extensively because the company
           believed that the drug was similar to Celebrex.

4     *The Named Plaintiff's Home District Times*, February 5, 2005.

5          42.    The Celebrex data relied upon by the Defendants was not adequate. On

6     July 23, 2005, the New England Journal of Medicine published the results of its investigative

7     research noting: "Most data on the cardiovascular risks associated with celecoxib have come

8     from observational studies or short-term randomized trials." N. ENG. J. MED. 352;25 at 2649.

9          43.    On December 23, 2004, three (3) researchers from the well-respected

10    Vanderbilt University published an article in the New England Journal of Medicine. The doctors

11    wrote: "To protect the safety of the public, we write to recommend that clinicians stop prescribing

12    Valdecoxib (Bextra) except in extraordinary circumstances." N. ENG. J. MED. 351;26. The

13    authors cite to two (2) recent studies "which showed a 3-fold increase in serious cardiovascular

14    injuries in patients receiving Valdecoxib after coronary-artery bypass grafting." Later, on

15    February 17, 2005, the New England Journal of Medicine published the results of a study

16    conducted by eight (8) doctors with similarly alarming results. N. ENG. J. MED. 2005;352.

17         44.    In January 2005, Drs. Fitzgerald, Furberg and Psaty published an editorial

18    in *Circulation*, the official journal of the American Heart Association. This editorial was based

19    on a meta-analysis of two (2) clinical studies, and discusses the association between intravenous

20    administration of an identical drug, and oral administration of Bextra. All three doctors found a

21    "3-fold higher risk of cardiovascular injuries with the drug than with a placebo." *Cir.* 2005;

22    111:249.

23         45.    The scientific data available during and after Bextra's approval process

24    made clear to Defendants that their formulation of Bextra would cause a higher risk of blood

25    clots, stroke and/or myocardial infarctions among Bextra consumers, alerting them to the need to

26    do additional and adequate safety studies.

27         46.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal

28    of Medicine*, outlining Defendants' failure to have conducted the necessary trials before

Bextra-MDL                              - 10 -                              COMPLAINT

1  marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular

2  risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with

3  established coronary artery disease, who frequently have coexisting osteoarthritis requiring

4  medication and have the highest risk of further cardiovascular events."

5        47.    Dr. Topol was also the author on the study published in August 2001 in

6  JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in

7  persons who used COX-2 inhibitors.

8        48.    Based upon readily available scientific data, Defendants knew, or should

9  have known, that their pre-approval testing of Bextra did not adequately represent the cross-

10  section of individuals who were intended consumers and therefore, likely to take Bextra.

11  Therefore, Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for

12  Bextra (noting that: "Platelets: In four clinical studies with young and elderly ($\geq 65$ years)

13  subjects, single and multiple doses up to 7 day mg BID had not effect on platelet aggregation").

14        49.    Had Defendants done adequate testing prior to approval and "market

15  launch," rather than the extremely short duration studies done on the small size patient base that

16  was actually done) Pharmacia and Searle's scientific data would have revealed significant

17  increases in incidence of strokes and myocardial infarctions among the intended and targeted

18  population of Bextra consumers. Adequate testing would have shown that Bextra possessed

19  serious side effects. Defendants should have taken appropriate measures to ensure that their

20  defectively designed product would not be placed in the stream of commerce and/or should have

21  provided full and proper warnings accurately and fully reflecting the scope and severity of

22  symptoms of those side effects should have been made.

23        50.    In fact, post-market approval data did reveal increased risks of clotting,

24  stroke and myocardial infarction, but Defendants intentionally suppressed this information in

25  order for them to gain significant profits from continued Bextra sales.

26        51.    Defendants' failure to conduct adequate testing and/or additional testing

27  prior to "market launch" was based upon their desire to generate maximum financial gains for

28  themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2

1  inhibitor market. At the time Defendants manufactured, advertising, and distributed Bextra to

2  consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding

3  the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants

4  knew that if such increased risks were disclosed, consumers would not purchase Bextra, but

5  instead would purchase other cheaper and safer NSAIDs.

### D.     Facts Regarding Defendants' Marketing and Sale of Bextra

7          52.     The defendants rushed Bextra to the market in an effort to regain Cox-2

8  market share. In response to the introduction of Vioxx, and without performing adequate

9  research, the Defendants hastily introduced their own more selective Cox-2 inhibitor, Bextra, to

10  the market. In doing so, Pfizer, admittedly, relied upon problematic research results from its

11  study of Celebrex.

12          53.     Pfizer stuck to its original plan – focus on marketing and avoid studying

13  Bextra. Thus, it was reported: "The positioning for Bextra began more than a year and a half

14  before it hit the market. Pharmacia conducted research about the arthritis market to examine gaps

15  in treatment, said Sylvia McBrinn, Pharmacia's Vice President for global marketing for Bextra."[1]

16  Bextra's marketing research was conducted over a year and a half, while science took a backseat,

17  with one small study for Bextra lasting not even one year and the rest lasting only weeks in

18  duration.

19          54.     At all times relevant herein, Defendants engaged in a marketing campaign

20  with the intent that consumers would perceive Bextra as a safer and better drug than its other

21  NSAIDs and, therefore, purchase Bextra.

22          55.     Such an ineffective and unreasonably dangerous drug could only be widely

23  prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the

24  Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and

25  misleading advertising, consumers would not have purchased Bextra, a more costly prescriptive

26  drug that was not effective for its intended purposes.

27

28

---

[1] *New Jersey Record*, North Jersey Media Group, Inc., April 14, 2002.

Bextra-MDL                              - 12 -                              COMPLAINT

1          56.    On January 10, 2005 the FDA issued Pfizer a written reprimand for its

2   promotional activities. The reprimand reads: "These five promotional pieces [3 Celebrex and 2

3   Bextra] variously: omit material facts … and make misleading safety, unsubstantiated superiority,

4   and unsubstantiated effectiveness claims." This was not the Defendants first offense related to its

5   Cox-2 inhibitors. The FDA also reprimanded Pfizer on October 6, 1999 noting: "DDMAC has

6   reviewed these promotional pieces and has determined that they are false or misleading because

7   they contain unsubstantiated comparative claims, misrepresentations of Celebrex's safety profile,

8   and are lacking in fair balance."

9          57.    Bextra was never approved for the treatment of acute pain. Without such

10   approval, Pfizer was prohibited from marketing Bextra for such an indication. Nevertheless, in

11   May of 2002, Pfizer issued a press release announcing the publication of a study in the Journal of

12   the American Dental Ass'n (JADA) concluding that Bextra is effective in the treatment of acute

13   pain associated with dental surgery. Interestingly, the dental study was sponsored by the

14   defendants and three of the five authors were employees of Pharmacia.

15          58.    Essentially, Pfizer was attempting to circumvent the FDA by promoting a

16   study it funded and authored for an unapproved use. Once the results were published, Pfizer's

17   aggressive promotional campaign continued. Pfizer issued a press release touting Bextra's

18   efficacy for the treatment of acute pain. After the press release, Dr. Steve Geis, Group Vice

19   President of Clinical Research was reported to have said the following: "Post-surgical pain can be

20   under-managed and cause patients tremendous discomfort. … This investigational study suggests

21   that Bextra may offer promise in acute pain management and further study is required."[2]

22          59.    Defendants widely and successfully marketed Bextra throughout the

23   United States by, among other things, conducting promotional campaigns that misrepresented the

24   efficacy of Bextra in order to induce a widespread use and consumption. Bextra was represented

25   to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made

26   misrepresentations by means of media advertisements, and statements contained in sales literature

27   provided to Plaintiff's prescribing physicians.

28
   ―――――――――――――――
   [2] Press Release: docguide.com March 25, 2002.

Bextra-MDL                           - 13 -                              COMPLAINT

60.     Despite knowledge of the dangers presented by Bextra, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Defendants' product, Bextra, and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product, Bextra. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product, Bextra, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiff.

61.     In an elaborate and sophisticated manner, Defendants aggressively marketed Bextra directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include Bextra on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payors were compelled to add Bextra to their formularies. Defendants' marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Bextra.

62.     Defendants represented that Bextra was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance, NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-term use. Defendants promoted Bextra as a safe and effective alternative that would not have the same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

63.     Bextra possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable

Bextra-MDL                           - 14 -                                    COMPLAINT

1  angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as

2  strokes. In addition, Bextra was no more effective than traditional and less expensive NSAIDs

3  and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal

4  bleeding. Defendants chose not to warn about these risks and dangers.

5          64.    Defendants knew of these risks before the U.S. Food and Drug

6  Administration (the "FDA") approved Bextra for sale on November 16, 2001, but Defendants

7  ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied

8  inefficacy in its promotion, advertising, marketing, and sale of Bextra. Defendants' omission,

9  suppression, and concealment of this important information enabled Bextra to be sold to, and

10  purchased, or paid for by, the Consumers at a grossly inflated price.

11         65.    Consequently, Bextra captured a large market share of anti-inflammatory

12  drugs prescribed for and used by patients. In 2004 alone sales of Bextra exceeded $1 billion,

13  despite the significantly higher cost of Bextra as compared to other pain relievers in the same

14  family of drugs.

15         66.    Because Defendants engaged in a promotional and marketing campaign

16  that featured an advertising blitz directly targeted to consumers, that touted Bextra as a safer drug

17  than other drugs in its class, while uniformly failing to disclose the health risks of Bextra,

18  Defendants were able to justify pricing Bextra significantly higher than the cost of generic

19  aspirin. In reality, that price inflation was not justified. Had Defendants disclosed the truth about

20  Bextra, Defendants would not and could not have reaped the billions of dollars in Bextra sales

21  that were achieved as a direct result of the concealment, omission, suppression, and obfuscation

22  of the truth.

23         67.    Instead of revealing the risks of Bextra, Defendants intentionally

24  downplayed the risks from Bextra in news releases when Bextra's safety was challenged for the

25  first time in the mainstream media. *See e.g.*, Nov. 10, 2004 Pfizer News Release ("Pfizer Inc.

26  said a Named Plaintiff's Home District Times article published today draws unsubstantiated

27  conclusions about the cardiovascular safety of its Cox-2 medicine Bextra . . ."). Defendants

28  similarly had earlier downplayed the risks in communicating to healthcare providers misleadingly

1    stating that "available clinical information for Bextra suggests there is no increased risk of
2    cardiovascular thromboembolic events in people treated for osteoarthritis (OA) and rheumatoid
3    arthritis (RA)" Oct. 15, 2004 *Pfizer News Release*. Defendants intentionally, deliberately,
4    knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material
5    information regarding the risks, dangers, defects, and disadvantages of Bextra from Plaintiff, the
6    public, the medical community, and the regulators. This concealment and omission was
7    deliberate, knowing, active, and uniform, was intended to induce and maximize sales and
8    purchases of Bextra, and prevented Plaintiff from obtaining all the material information that
9    would be important to their decisions as reasonable persons to purchase, pay for, and/or use
10   Bextra.

11           68.    Defendants' systematic, active, knowing, deliberate, and uniform
12   concealment, omissions, suppression, and conduct caused Plaintiff to purchase, pay for, and/or
13   use Bextra; and caused Plaintiff's losses and damages as asserted herein.

14           69.    Had Defendants done adequate testing prior to approval and "market
15   launch," Pharmacia's scientific data would have revealed significant increases in stroke and
16   myocardial infarction amongst the intended population of Bextra consumers. Adequate testing
17   would have shown that Bextra possessed serious side effects. Defendants should have taken
18   appropriate measures to ensure that their defectively designed product would not be placed in the
19   stream of commerce and/or should have provided full and proper warnings accurately and fully
20   reflecting the scope and severity of symptoms of those side effects should have been made.

21           70.    In fact, post-market approval data did reveal increased risks of clotting,
22   stroke and myocardial infarction, but this information was intentionally suppressed by Defendants
23   in order for them to gain significant profits from continued Bextra sales.

24           71.    Defendants' failure to conduct adequate testing and/or additional testing
25   prior to "market launch" was based upon their desire to generate maximum financial gains for
26   themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2
27   inhibitor market.

28

Bextra-MDL                              - 16 -                              COMPLAINT

72.     At the time Defendants manufactured, advertising, and distributed Bextra to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase Bextra, but instead would purchase other cheaper and safer NSAID drugs.

73.     At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive Bextra as a better drug than its competitors and, therefore, purchase Bextra.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
#### Negligence

74.     Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

75.     Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling Bextra.  This duty included the duty not to introduce a pharmaceutical drug, such as Bextra, into the stream of commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

76.     At all relevant times to this action, Defendants owed a duty to properly warn Plaintiff and the Public of the risks, dangers and adverse side effects of their pharmaceutical drug Bextra.

77.     Defendants breached their duties by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, promotion, advertising and selling of Bextra, including:

a.     failing to use due care in the preparation and development of Bextra to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

b.     failing to use due care in the design of Bextra to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

1               c.      failing to conduct adequate pre-clinical testing and research to

2 determine the safety of Bextra;

3               d.      failing to conduct adequate post-marketing surveillance and

4 exposure studies to determine the safety of Bextra;

5               e.      failing to completely, accurately and in a timely fashion, disclose

6 the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff,

7 consumers, the medical community, and the FDA;

8               f.      failing to accompany Bextra with proper warnings regarding all

9 possible adverse side effects associated with the use of Bextra;

10               g.      failing to use due care in the manufacture, inspection, and labeling

11 of Bextra to prevent the aforementioned risk of injuries to individuals who used Bextra;

12               h.      failing to use due care in the promotion of Bextra to prevent the

13 aforementioned risk of injuries to individuals when the drugs were ingested;

14               i.      failing to use due care in the sale and marketing of Bextra to

15 prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

16               j.      failing to use due care in the selling of Bextra to prevent the

17 aforementioned risk of injuries to individuals when the drugs were ingested;

18               k.      failing to provide adequate and accurate training and information to

19 the sales representatives who sold Bextra;

20               l.      failing to provide adequate and accurate training and information to

21 healthcare providers for the appropriate use of Bextra; and

22               m.      being otherwise reckless, careless and/or negligent.

23         78.      Despite the fact that Defendants knew or should have known that Bextra

24 caused unreasonable and dangerous side effects which many users would be unable to remedy by

25 any means, Defendants continued to promote and market Bextra to consumers, including

26 Plaintiff, when safer and more effective methods of pain relief were available.

27         79.      Defendants were, or should have been, had they exercised reasonable care,

28 in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

1    they continued to market their products by providing false and misleading information with
2    regard to the safety and efficacy of Bextra.

3        80.    Defendants knew or should have known that consumers such as Plaintiff
4    would foreseeably suffer injury as a result of their failure to exercise ordinary care as described
5    above.

6        81.    As a result of Defendants' actions, Plaintiff, and the Plaintiff's prescribing
7    physicians were unaware, and could not have reasonably known or have learned through
8    reasonable diligence, that the Plaintiff had been exposed to the risks identified in this complaint,
9    and that those risks were the direct and proximate result of Defendants' acts, omissions, and
10   misrepresentations.

11       82.    Defendants were, or should have been had they exercised reasonable care,
12   in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,
13   they continued to market their products by providing false and misleading information with
14   regard to the safety and efficacy of Bextra.

15       83.    Defendants knew or should have known that consumers such as Plaintiff
16   would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described
17   above.

18       84.    As a direct and proximate consequence of Defendants' acts, omissions, and
19   misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has
20   required and will require healthcare and services; has incurred and will continue to incur medical
21   and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the
22   future; has suffered and will continue to suffer mental anguish, diminished capacity for the
23   enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of
24   preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's
25   direct medical losses and costs include care for hospitalization, physician care, monitoring,
26   treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

27       85.    Defendants' conduct was committed with knowing, conscious, wanton,

28

Bextra-MDL                              - 19 -                                    COMPLAINT

1  willful, and deliberate disregard for the value of human life and the rights and safety of

2  consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

3  as to punish Defendants and deter them from similar conduct in the future.

4  WHEREFORE, Plaintiff demands judgment against Defendants and seeks

5  compensatory damages, and exemplary and punitive damages together with interest, the costs of

6  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

7  ## SECOND CLAIM FOR RELIEF:
   ### Strict Liability – Defective Design and Failure to Warn

8

9  86.     Plaintiff incorporates by reference all previous paragraphs of this

10  Complaint as if fully set forth herein and further alleged as follows:

11  87.     At all times relevant to this action, Defendants were suppliers of Bextra,

12  placing the drug into the stream of commerce. Bextra was expected to and did reach Plaintiff

13  without substantial change in the condition in which it was manufactured and sold.

14  88.     Bextra was unsafe for normal or reasonably anticipated use.

15  89.     Bextra was defective in design or formulation because when it left the

16  hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous

17  than an ordinary consumer would expect. Bextra was also defective and unreasonably dangerous

18  in that the foreseeable risk of injuries from Bextra exceeded the benefits associated with the

19  design and/or formulation of the product.

20  90.     At all times material hereto, Bextra was sold, marketed, distributed,

21  supplied, manufactured and/or promoted by the Defendant, in a defective and unreasonably

22  dangerous condition at the time it was placed in the stream of commerce in ways which include,

23  but are not limited to, one or more of the following particulars.

24  91.     When placed in the stream of commerce, the drug contained unreasonably

25  dangerous design defects and was not reasonably safe as intended to be used, subjecting

26  Plaintiff's Plaintiff to risks which exceeded the benefits of the drug:

27

28

Bextra-MDL                              - 20 -                              COMPLAINT

1                      a.      When placed in the stream of commerce, it was defective in design

2 and formulation, making use of the drug more dangerous than an ordinary consumer would

3 expect and more dangerous than other similar drugs;

4                      b.      The drug was insufficiently tested;

5                      c.      The drug caused harmful side effects which outweighed any

6 potential utility;

7                      d.      The drug was not accompanied by adequate instructions and/or

8 warnings to fully apprize the consumers, including the Plaintiff, of the full nature or extent of the

9 risks and side effects associated with use, thereby rendering Defendants liable to the Plaintiff and

10 Plaintiff, individually and collectively, pursuant to the Restatement (Second) of Torts, § 402A, as

11 adopted by the Named Plaintiff's Home District Courts.

12        92.      The drug was defective and unreasonably dangerous when it left the

13 possession of the Defendants in that it contained warnings insufficient to alert consumers,

14 including the Plaintiff, to the dangerous risks and reactions associated with the drug, including,

15 but not limited to, increased risk of cardiovascular events, and other serious and life threatening

16 side affects.

17        93.      The Plaintiff could not have discovered any defect in the drug through the

18 exercise of care.

19        94.      Defendants, as manufacturers of a prescription drug, are held to the level of

20 knowledge of an expert in the field.

21        95.      Bextra as manufactured and supplied by Defendants was also defective due

22 to inadequate warnings, and/or inadequate clinical trials, testing and study, and inadequate

23 reporting regarding the results of the clinical trials, testing and study. Defendants failed to

24 perform adequate testing before exposing Plaintiff to the medication, testing which would have

25 shown that Bextra had the potential to cause serious side effects including strokes like that which

26 affected Plaintiff.

27        96.      Bextra as manufactured and supplied by Defendants was defective due to

28 inadequate post-marketing warnings or instructions because, after Defendants knew or should

Bextra-MDL                          - 21 -                                 COMPLAINT

1  have known of the risk of injuries from Bextra, they failed to provide adequate warnings to the

2  medical community and the consumers, to whom they were directly marketing and advertising

3  Bextra; and, further, it continued to affirmatively promote Bextra as safe and effective.

4           97.     Bextra was manufactured, distributed, tested, sold, marketed, advertised

5  and promoted defectively by Defendants, and as a direct and proximate cause of Defendants'

6  defective design of Bextra, Plaintiff used Bextra rather than other safer and cheaper NSAIDs.  As

7  a result, Plaintiff suffered the personal injuries described above.

8           98.     Information given by Defendants to the medical community and to the

9  consumers concerning the safety and efficacy of Bextra, especially the information contained in

10  the advertising and promotional materials, did not accurately reflect the potential side effects of

11  Bextra.

12          99.     Defendants had a continuing duty to warn the Plaintiff of the dangers

13  associated with the drug.

14          100.    Had adequate warnings and instructions been provided, Plaintiff would not

15  have taken Bextra, and would not have been at risk of the harmful side effects described herein.

16          101.    Defendants acted with conscious and deliberate disregard of the

17  foreseeable harm caused by Bextra.

18          102.    Defendants were, or should have been had they exercised reasonable care,

19  in possession of evidence demonstrating that Bextra caused serious side effects.  Nevertheless,

20  they continued to market their products by providing false and misleading information with

21  regard to the safety and efficacy of Bextra.

22          103.    Defendants knew or should have known that consumers such as Plaintiff

23  would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

24  above.

25          104.    As a direct and proximate consequence of Defendants' acts, omissions, and

26  misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

27  required and will require healthcare and services; has incurred and will continue to incur medical

28  and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

Bextra-MDL                              - 22 -                              COMPLAINT

1   future; has suffered and will continue to suffer mental anguish, diminished capacity for the

2   enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

3   preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

4   direct medical losses and costs include care for hospitalization, physician care, monitoring,

5   treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

6       105.    Defendants' conduct was committed with knowing, conscious, wanton,

7   willful, and deliberate disregard for the value of human life and the rights and safety of

8   consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

9   as to punish Defendants and deter them from similar conduct in the future.

10      WHEREFORE, Plaintiff demands judgment against Defendants and seeks

11  compensatory damages, and exemplary and punitive damages together with interest, the costs of

12  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

13  ### THIRD CLAIM FOR RELIEF:
    #### Breach of Express Warranty

14      106.    Plaintiff incorporates by reference all of the paragraphs of this Complaint

15  as if fully set forth herein.

16      107.    Defendants expressly represented to Plaintiff and other consumers and the

17  medical community that Bextra was safe and fit for its intended purposes, that it was of

18  merchantable quality, that it did not produce any dangerous side effects, particularly any

19  unwarned-of side effects, and that it was adequately tested.

20      108.    These warranties came in the form of:

21          a.    Defendants' public written and verbal assurances of the safety and

22  efficacy of Bextra;

23          b.    Press releases, interviews and dissemination via the media of

24  promotional information, the sole purpose of which was to create an increased demand for

25  Bextra, which failed to warn of the risk of injuries inherent to the ingestion of Bextra, especially

26  to the long-term ingestion of Bextra;

27

28

1                      c.      Verbal and written assurances made by Defendants regarding
2  Bextra and downplaying the risk of injuries associated with the drug;
3                      d.      False and misleading written information, supplied by Defendants,
4  and published in the Physician's Desk Reference on an annual basis, upon which physicians
5  relied in prescribing Bextra during the period of Plaintiff's ingestion of Bextra, and;
6                      e.      advertisements.
7          109.    The documents referred to above were created by and at the direction of
8  Defendants.
9          110.    Defendants knew or had reason to know that Bextra did not conform to
10  these express representations in that Bextra is neither as safe nor as effective as represented, and
11  that Bextra produces serious adverse side effects.
12         111.    Bextra did not and does not conform to Defendants' express
13  representations because it is not safe, has numerous and serious side effects, including unwarned-
14  of side effects, and causes severe and permanent injuries.
15         112.    Plaintiff, other consumers, and the medical community relied upon
16  Defendants' express warranties.
17         113.    Defendants were, or should have been had they exercised reasonable care,
18  in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,
19  they continued to market their products by providing false and misleading information with
20  regard to the safety and efficacy of Bextra.
21         114.    Defendants knew or should have known that consumers such as Plaintiff
22  would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described
23  above.
24         115.    As a direct and proximate consequence of Defendants' acts, omissions, and
25  misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has
26  required and will require healthcare and services; has incurred and will continue to incur medical
27  and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the
28  future; has suffered and will continue to suffer mental anguish, diminished capacity for the

Bextra-MDL                              - 24 -                              COMPLAINT

1  enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

2  preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

3  direct medical losses and costs include care for hospitalization, physician care, monitoring,

4  treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

5      116.    Defendants' conduct was committed with knowing, conscious, wanton,

6  willful, and deliberate disregard for the value of human life and the rights and safety of

7  consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

8  as to punish Defendants and deter them from similar conduct in the future.

9      WHEREFORE, Plaintiff demands judgment against Defendants and seeks

10  compensatory damages, and exemplary and punitive damages together with interest, the costs of

11  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

12
### FOURTH CLAIM FOR RELIEF:
#### Breach of Implied Warranty

13
14      117.    Plaintiff incorporates by reference all of the paragraphs of this Complaint
as if fully set forth herein.

15
16      118.    Defendants manufactured, distributed, advertised, promoted, and sold
Bextra.

17
18      119.    At all relevant times, Defendants knew of the use for which Bextra was
intended and impliedly warranted the product to be of merchantable quality and safe and fit for

19  such use.

20
21      120.    Defendants were aware that consumers, including Plaintiff, would use
Bextra for treatment of pain and inflammation and for other purposes.

22
23      121.    Plaintiff and the medical community reasonably relied upon Defendants'
judgment and expertise to only sell them or allow them to prescribe Bextra only if it was indeed

24  of merchantable quality and safe and fit for its intended use. Consumers, including Plaintiff, and

25  the medical community, reasonably relied upon Defendants' implied warranty for Bextra.

26      122.    Bextra reached consumers, including Plaintiff, without substantial change
27  in the condition in which it was manufactured and sold by Defendants.

28

Bextra-MDL                       - 25 -                       COMPLAINT

123.    Defendants breached their implied warranty to consumers, including Plaintiff; Bextra was not of merchantable quality or safe and fit for its intended use.

124.    Defendants were, or should have been had they exercised reasonable care, in possession of evidence demonstrating that Bextra caused serious side effects.  Nevertheless, they continued to market their products by providing false and misleading information with regard to the safety and efficacy of Bextra.

125.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described above.

126.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages.  Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.  Plaintiff will continue to incur such losses in the future.

127.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

1

**FIFTH CLAIM FOR RELIEF:**
**Fraudulent Misrepresentation & Concealment**

2

128.    Plaintiff incorporates by reference all of the paragraphs of this Complaint

3

as if fully set forth herein.

4

129.    Defendants' superior knowledge and expertise, their relationship of trust

5

and confidence with doctors and the public, their specific knowledge regarding the risks and

6

dangers of Bextra, and their intentional dissemination of promotional and marketing information

7

about Bextra for the purpose of maximizing its sales, each gave rise to the affirmative duty to

8

meaningfully disclose and provide all material information about Bextra's risks and harms to

9

doctors and consumers.

10

130.    Defendants made fraudulent affirmative misrepresentations with respect to

11

Bextra in the following particulars:

12

a.    Defendants represented through their labeling, advertising,

13

marketing materials, detail persons, seminar presentations, publications, notice letters, and

14

regulatory submissions that Bextra had been tested and found to be safe and effective for the

15

treatment of pain and inflammation; and

16

b.    Defendants represented that Bextra was safer than other alternative

17

medications.

18

131.    Defendants made affirmative misrepresentations; and fraudulently,

19

intentionally and/or recklessly concealed material adverse information regarding the safety and

20

effectiveness of Bextra.

21

132.    Defendants made these misrepresentations and actively concealed adverse

22

information at a time when Defendants knew or had reason to know that Bextra had defects and

23

was unreasonably dangerous and was not what Defendants had represented to the medical

24

community, the FDA and the consuming public, including Plaintiff.

25

133.    Defendants omitted, suppressed and/or concealed material facts concerning

26

the dangers and risk of injuries associated with the use of Bextra including, but not limited to, the

27

cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'

28

1   purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the

2   serious nature of the risks associated with the use of Bextra in order to increase its sales.

3          134.    The representations and concealment were undertaken by Defendants with

4   an intent that doctors and patients, including Plaintiff, rely upon them.

5          135.    Defendants' representations and concealments were undertaken with the

6   intent of defrauding and deceiving Plaintiff, other consumers, and the medical community to

7   induce and encourage the sale of Bextra.

8          136.    Defendants' fraudulent representations evinced their callous, reckless,

9   willful, and depraved indifference to the health, safety, and welfare of consumers, including

10  Plaintiff.

11         137.    Plaintiff's physician and Plaintiff relied on and were induced by

12  Defendants' misrepresentations, omissions, and/or active concealment of the dangers of Bextra in

13  selecting Bextra treatment.

14         138.    Plaintiff and the treating medical community did not know that the

15  representations were false and were justified in relying upon Defendants' representations.

16         139.    Had Plaintiff been aware of the increased risk of side effects associated

17  with Bextra and the relative efficacy of Bextra compared with other readily available

18  medications, Plaintiff would not have taken Bextra.

19         140.    Defendants were, or should have been had they exercised reasonable care,

20  in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

21  they continued to market their products by providing false and misleading information with

22  regard to the safety and efficacy of Bextra.

23         141.    Defendants knew or should have known that consumers such as Plaintiff

24  would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

25  above.

26         142.    As a direct and proximate consequence of Defendants' acts, omissions, and

27  misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

28  required and will require healthcare and services; has incurred and will continue to incur medical

Bextra-MDL                          - 28 -                          COMPLAINT

1   and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

2   future; has suffered and will continue to suffer mental anguish, diminished capacity for the

3   enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

4   preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

5   direct medical losses and costs include care for hospitalization, physician care, monitoring,

6   treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

7          143.    Defendants' conduct was committed with knowing, conscious, wanton,

8   willful, and deliberate disregard for the value of human life and the rights and safety of

9   consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

10  as to punish Defendants and deter them from similar conduct in the future.

11         WHEREFORE, Plaintiff demands judgment against Defendants and seeks

12  compensatory damages, and exemplary and punitive damages together with interest, the costs of

13  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

14                         **SIXTH CLAIM FOR RELIEF**
                              **(Unjust Enrichment)**
15
           144.    Plaintiff incorporates by reference all previous paragraphs of this
16
    Complaint as if fully set forth herein.
17
           145.    At all times relevant to this action, Defendants were the manufacturers,
18
    sellers, and/or suppliers of Bextra.
19
           146.    Plaintiff paid for Bextra for the purpose of managing her pain safely and
20
    effectively.
21
           147.    Defendants have accepted payment from Plaintiff for the purchase of
22
    Bextra.
23
           148.    Plaintiff did not receive the safe and effective pharmaceutical product for
24
    which Plaintiff paid.
25
           149.    It is inequitable and unjust for Defendants to retain this money because the
26
    Plaintiff did not in fact receive the product Defendant represented Bextra to be.
27
                   WHEREFORE, Plaintiff demands judgment against Defendants and seeks
28

1    equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court

2    deems just and proper.

3                                      **PRAYER FOR RELIEF**

4                      WHEREFORE, Plaintiff requests the following relief:

5        1.       General damages in excess of the jurisdictional amount of this Court;

6        2.       Consequential damages;

7        3.       Disgorgement of profits;

8        4.       Restitution;

9        5.       Punitive and exemplary damages;

10       6.       Pre-judgment and post-judgment interest as provided by law;

11       7.       Recovery of Plaintiff's costs including, but not limited to, discretionary

12   Court costs of these causes, and those costs available under the law, as well as expert fees and

13   attorneys' fees and expenses, and costs of this action; and

14       8.       Such other and further relief as the Court deems just and proper.

15

16   Dated: February 15, 2008                    Respectfully submitted,

17

18                                               By:_____

19                                               B. Kristian W. Rasmussen, FL Bar No. 0229430
                                                 Cory, Watson, Crowder, & DeGaris
20                                               2131 Magnolia Avenue, STE 200
                                                 Birmingham, AL 35205
21                                               Phone: (205) 328-2200
                                                 Fax: (205) 324-7896
22                                               E-Mail: krasmussen@cwcd.com

23                                               Attorneys for Plaintiff

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands a trial by jury on all claims so triable in this action.

3

Dated: February 15, 2008                    Respectfully submitted,

4

5

6

By:

7

B. Kristian W. Rasmussen, FL Bar No. 0229430
Cory, Watson, Crowder, & DeGaris

8

2131 Magnolia Avenue, STE 200
Birmingham, AL 35205

9

Phone: (205) 328-2200
Fax: (205) 324-7896

10

E-Mail: krasmussen@cwcd.com

11

Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bextra-MDL                            - 31 -                            COMPLAINT